# EXHIBIT 4

1              UNITED STATES DISTRICT

2          WESTERN DISTRICT OF WASHINGTON

3                  AT SEATTLE

4

5   NICLAS FOSTER, as Personal              )
    Representative of the Estate of         )
6   MEIKE FOSTER,                           )
                                            )   Case No.
7                  Plaintiff,               )
                                            )   17-cv-01727-JCC
8          vs.                              )
                                            )
9   AMERICAN HONDA MOTOR COMPANY,           )
    INC., a foreign corporation;            )
10  HONDA MOTOR COMPANY, LTD., a            )
    foreign corporation; HONDA NORTH        )
11  AMERICA, INC., a foreign                )
    corporation; HONDA OF CANADA            )
12  MANUFACTURING d/b/a HONDA OF            )
    CANADA, INC., a foreign                 )
13  corporation; HONDA R&D AMERICAS,        )
    INC., a foreign corporation,            )
14                                          )
                   Defendants.              )
15

16

17
          DEPOSITION OF GRZEGORZ BUCZKOWSKI, PH.D.
18

19                  June 27, 2019

20                  10:15 a.m.

21
              810 Third Avenue, Suite 500
22
                Seattle, Washington
23

24

25          Eva P. Jankovits, CCR No. 1915



```
 1                        APPEARANCES OF COUNSEL

 2

    On Behalf of the Plaintiff:
 3
         THOMAS J. BREEN
 4       PETER O'NEIL
         Schroeter Goldmark & Bender
 5       810 Third Avenue
         Suite 500
 6       Seattle, WA  98104-1619
         206.622.8000
 7       206.682.2305 Fax
         breen@sgb-law.com
 8       peteroneil@sgb-law.com

 9

10  On Behalf of the Defendants:

11       DAVID J. RUSSELL
         Keller Rohrback, LLP
12       1201 Third Avenue
         Suite 3200
13       Seattle, WA  98101-3052
         206.623.1900
14       206.623.3384 Fax
         drussell@kellerrohrback.com
15

16

17

18

19

20

21

22

23

24

25
```



GRZEGORZ BUCZKOWSKI, PH.D.                                    June 27, 2019
NICLAS FOSTER vs AMERICAN HONDA MOTOR                                     3

```
1                        INDEX OF EXAMINATION

2
     WITNESS:  GRZEGORZ BUCZKOWSKI, PH.D.
3

4
     EXAMINATION                                      PAGE
5
     BY MR. RUSSELL                                       4
6

7
                      INDEX TO EXHIBITS
8
     DEFENDANTS'    DESCRIPTION                       PAGE
9
     Exhibit No. 1   2-page Subpoena to Testify at       4
10                   a Deposition in a Civil
                     Action
11
     Exhibit No. 2   9 pages, black & white              4
12                   photocopies

13   Exhibit No. 3   72 pages, various documents          4

14   Exhibit No. 4   6-page curriculum vitae             4

15   Exhibit No. 5   7-page Rodent biology and           4
                     nesting behavior as relates
16                   to the automobile industry -
                     Expert Report dated 1/14/18
17
     Exhibit No. 6   1-page typed document               4
18
     Exhibit No. 7   1-page color aerial photocopy      37
19
     Exhibit No. 8   1-page handwritten document        40
20

21

22              PREVIOUSLY MARKED EXHIBITS

23   NO.  DESCRIPTION                             PAGE NO.

24        (No exhibits marked for identification.)

25
```



```
 1              DEPOSITION OF GRZEGORZ BUCZKOWSKI, PH.D.

 2                          June 27, 2019

 3

 4                          (Exhibit Nos. 1 through 6

 5                              marked for identification.)

 6

 7                  GRZEGORZ BUCZKOWSKI, PH.D.,

 8     having been first duly sworn, testified as follows:

 9

10                          EXAMINATION

11    BY MR. RUSSELL:

12        Q.   Good morning, Dr. Buczkowski.  Did I pronounce

13    that correctly?

14        A.   Yes.  Buczkowski, that's correct.

15        Q.   Bucz?

16        A.   Mm-hm.

17        Q.   So it's "Bucz," B-u --

18        A.   Yes, Bucz.  Bucz -- Buczkowski.

19        Q.   Okay.

20        A.   Buczkowski.

21        Q.   I'll do my best.

22             My name is David Russell.  I represent the

23    defendants in this case which you've been retained.

24             Have you ever testified as an expert before?

25        A.   This is my first case, so I have not.
```



1      Q.   Okay.  And have you ever been retained as an

2   expert before?

3      A.   I have not.

4      Q.   Okay.  How did you come in contact with these

5   lawyers sitting to your right?

6      A.   They initially contacted me by e-mail back in

7   December -- around December.  We followed up with a

8   phone interview --

9      Q.   Mm-hm.

10      A.   -- where we discussed the matter.  And then

11   they decided to retain me as the expert witness in the

12   Foster case.

13      Q.   Okay.  And how much per hour are you charging

14   them?

15      A.   Depending on -- when I'm reviewing, the

16   reviews are $350 per hour, deposition fee is $400 an

17   hour.

18      Q.   Okay.  And approximately how much time have

19   you put into this case outside of travel time up until

20   today?

21      A.   So initially I spent time preparing the report

22   that you have a copy of, so that was approximately, I

23   would say, gathering evidence, writing the report,

24   preparing for it, at least ten hours of time for the

25   initial report, collecting references and so forth, and



1    then everything from yesterday.  So we spent --

2    yesterday we met around 1:30, and we finished later in

3    the evening.  So about almost -- I mean, I would say

4    probably eight to -- about eight hours yesterday, as

5    well as today, this morning.

6        Q.   So you started at 1:30 and you believe you

7    finished about 9:30 last night?

8        A.   That would be correct.

9        Q.   Okay.  And with whom did you meet yesterday?

10       A.   I met with both David and Tom.

11       Q.   Peter and Tom.

12       A.   Sorry.  Peter and Tom.

13       Q.   I'm David.

14       A.   Right.

15       Q.   Peter.

16       A.   Exactly, yes.

17       Q.   And where did you meet, here in the office or

18   elsewhere?

19       A.   We met in different locations.  Initially here

20   in the office.  Later we actually took a trip to both --

21   to see the vehicle for this case, as well as the actual

22   site where the actual -- where the accident happened.

23       Q.   Okay.

24       A.   Later we also had dinner together.

25       Q.   Were you shown a baggie of pine needles



1   yesterday?

2        A.   No.  I didn't see a bag of needles yesterday,

3   no.

4        Q.   Have you ever seen pine needles or tree

5   material that was recovered from the vehicle?

6        A.   I have.  I have seen pictures of it, yes.

7        Q.   Pictures.

8        A.   Yes.

9        Q.   And when did you first see pictures of those

10  needles?

11       A.   When I was -- it was back when I was preparing

12  my report for this, so around January, December/January.

13  I think my report I prepared in the first week of

14  January, so I would say early January is when I saw the

15  pictures in the -- in the report showing the color of

16  the needles that were recovered from the fire.

17            THE COURT REPORTER:  Showing the what?

18            THE WITNESS:  Color of the needles recovered

19  from the fire.

20       A.   Because they're not exactly pine needles but

21  conifer.

22       Q.   (By Mr. Russell)  Do you -- do you know what

23  type of tree they're from?

24       A.   I would say either fir or spruce.

25       Q.   Okay.  We have more fir than spruce here in



1   Western Washington.  But you think they're not pine

2   trees?

3        A.    They're not pine.

4        Q.    Okay.  Awesome.

5              Let me show you what we've marked as Exhibit 6

6   to your deposition.  I'll get to the other -- others in

7   a moment.

8              When was Exhibit 6 prepared?

9        A.    It was prepared yesterday in the -- during --

10  during our meeting.

11       Q.    And was it prepared at the end of all of the

12  work that you did with Tom and Peter?

13       A.    It was prepared towards the end of the day,

14  yes.  And I made some edits this morning as well just

15  preparing.

16       Q.    And who prepared the first draft of Exhibit 6?

17       A.    We prepared it together discussing -- as we're

18  discussing this case.

19       Q.    Who was manually typing while Exhibit 6 -- the

20  first draft of the Exhibit 6 was being prepared?

21       A.    We both -- Tom and I, we prepared it.

22       Q.    On Exhibit 6, under 3A, it says, Honda's

23  records on similar 2002 to 2014 CRVs identify rodent

24  activity in the same location.

25              When were you first shown Honda records on



1   similar 2002 to 2014 CRVs?

2        A.   I believe that was -- yesterday was -- it was

3   not during the initial contact.  It was -- it was

4   yesterday.

5        Q.   Okay.  And did Tom and Peter show those

6   records to you yesterday?

7        A.   Yes.

8        Q.   Do you have a copy of the records that you

9   were shown with you?

10       A.   I have copies.

11       Q.   On the thumb drive?

12       A.   As well as printed hard copies in the -- in

13  that stack.  Should be right there.  Or -- or did Ann --

14  I did have copies yesterday, hard copies yesterday.  I

15  think --

16       Q.   Okay.

17       A.   -- Ann collected them.

18       Q.   In any event, you were provided with some

19  documents yesterday that you had not seen before and

20  that -- and those records are the basis for your opinion

21  3A, correct?

22       A.   That would be correct.

23       Q.   Okay.  3C, it says, The car was located in an

24  area that would be full of rodents.

25            I didn't see that opinion in your initial



1    report.  Is that based on visiting the scene yesterday?

2         A.   That's based on the scene yesterday, yes.

3         Q.   Okay.  And so yesterday was the first time

4    that you formulated that opinion in this case?

5         A.   Just seeing the site, yes.

6         Q.   Okay.

7         A.   Although rodents are ubiquitous, so...

8         Q.   And when you say, "The car was located in an

9    area that would be full of rodents," do you mean the

10   area where the fire happened or some other area?

11        A.   Actually, both.  The area where she was

12   initially parked in the parking lot close to the club,

13   as well as the actual fire, where the fire happened.

14        Q.   Okay.  And do you believe that the rodent

15   first entered the vehicle in the area where the fire

16   happened?

17        A.   We -- we don't know exactly where the rodent

18   entered the vehicle.  The nest could have been made in

19   another area, but we -- we do know that the -- the

20   needles recovered from the -- from the vehicle, and it's

21   indicative of rodent behavior.

22        Q.   Do you have an opinion, to a reasonable degree

23   of scientific certainty, as to when a rodent entered

24   Mrs. Foster's undercarriage?

25        A.   That could have -- that could have happened at



1   any point.  We don't know how long the nest has been
2   there.

3        Q.    Let me ask my question again because it was
4   very precise.

5             Do you have an opinion, to a reasonable degree
6   of scientific certainty, as to when a rodent entered the
7   undercarriage of Ms. Foster's vehicle?

8        A.    I don't know exactly when -- when it would
9   have entered.

10       Q.    Do you have any idea when?

11       A.    I can't be certain exactly when the rodents
12   entered the vehicle.

13       Q.    Do you know -- do you have an opinion to a
14   reasonable degree of scientific certainty where the
15   vehicle was when a rodent entered the undercarriage?

16       A.    Also can't say exactly where the -- the
17   vehicle was when the rodent entered the --

18       Q.    Okay.

19       A.    -- the vehicle.

20       Q.    So let me -- let me tell you how depositions
21   work.  As soon as you say "I can't tell you exactly," I
22   have to ask you again.  So if you have an opinion, tell
23   me; otherwise, I'm going to have to ask you again.

24             Do you have any idea where the vehicle was
25   when the rodent -- when a rodent entered the



1   undercarriage of Ms. Foster's vehicle?

2       A.   No, I -- I don't.

3       Q.   Okay.  Do you have an opinion to a reasonable

4   degree of scientific certainty as to whether we're

5   talking about a mouse or a rat or some other rodent?

6       A.   No.

7       Q.   Okay.  Do you have any evidence that there was

8   a nest built in Ms. Foster's undercarriage other than

9   the conifer needles that you have seen photos of?

10      A.   No direct evidence.

11      Q.   Do you have any indirect evidence?

12      A.   My inspection -- my inspection of similar

13  vehicles and -- as well as previous cases involving

14  other Honda CRVs.

15      Q.   Okay.  So you're talking about the 3A opinion

16  here on Exhibit 6?

17      A.   Right.

18      Q.   Okay.  And you just said "inspection of other

19  vehicles."

20      A.   The one I inspected in Indiana --

21      Q.   Okay.

22      A.   -- was a 2012 CRV.

23      Q.   Okay.  And we'll get into that in detail, but

24  your inspection of the -- the CRV in Indiana, did it

25  tell you anything about whether in fact there was a



1    rodent nest built in Ms. Foster's vehicle?

2         A.    It did not.

3         Q.    I mean, I read your opinion.  I know what your

4    opinions are about the -- the layout of the --

5         A.    Design.

6         Q.    -- undercarriage.

7         A.    Yes.

8         Q.    But I just want to make sure that we're clear

9    on what evidence you have that a rodent in fact built a

10   nest in Ms. Foster's vehicle specifically at any time

11   before the fire.

12             Is there anything other than the needles --

13   the conifer needles that you've seen and the Honda

14   documents that you were shown yesterday?

15        A.    No.

16        Q.    Okay.  You are a professor in the Department

17   of Entomology at Purdue University, correct?

18        A.    That's correct.

19        Q.    And I do this with every expert, so please

20   don't take offense to this.  I just want to make sure

21   that I know exactly what you're an expert in and what

22   you're not an expert in.

23             You're not holding yourself out as an expert

24   in automotive design, are you?

25        A.    I'm not.



1    Q.   And you're not holding yourself out as an

2    expert in fire cause and origin, correct?

3        A.   I am not.

4        Q.   And you don't have an opinion in this case as

5    to what caused the fire that burned up Ms. Foster's

6    vehicle, correct?

7        A.   Well, I -- I do have an opinion based on,

8    again, several lines of evidence, including preview

9    Honda reports, my -- my own inspection of other similar

10   vehicles, and...

11       Q.   You said this twice now.  Your inspection of

12   other similar vehicles.

13            Was there more than one vehicle --

14       A.   No.  Actually, just one.

15       Q.   -- that you've inspected?

16       A.   One.

17       Q.   Okay.

18       A.   Mm-hm.

19       Q.   So you inspected Ms. Foster's vehicle in its

20   post fire condition?

21       A.   Yes.

22       Q.   And you inspected the vehicle in Indiana?

23       A.   Yes, mm-hm.

24       Q.   Okay.  How do you know that this fire was not

25   started as a result of the -- Ms. Foster's catalytic



1   coming in contact with materials underneath the vehicle

2   during the time that she was parked off the roadway?

3       A.   So when I visited the site yesterday, I

4   actually -- I -- we looked at the ground cover.  That's

5   the ivy that -- that was -- it's on the ground.  I

6   didn't see a lot of organic, dried -- dried debris on

7   the ground.  It was -- again, it was living -- living

8   plants within green ivy.  That's -- the ground was

9   actually wet.  It rained a little bit yesterday.  I

10  touched the ground.  It was soaked.  It was wet.  We

11  actually poked through the ivy, and it was -- it was

12  saturated.

13      Q.   But -- but this -- these facts, although you

14  may have talked with Tom and Peter about them, these

15  would not be within your area of expertise as an

16  entomologist, would they?  Like what causes a fire,

17  that's not your area of expertise, right?

18      A.   It is not, yeah.

19      Q.   Okay.  Did you see conifer needles underneath

20  the ivy?

21      A.   There were some.  There were some -- some on

22  the ground because there were trees nearby that --

23      Q.   Okay.

24      A.   -- produce conifer needles, yes.

25      Q.   All right.  And do you know whether or not a



1    fire department responded to this fire?

2         A.   I do know that they did respond, yes.

3         Q.   And do you -- is it your understanding that

4    they sprayed water on the vehicle and the ground

5    surrounding the vehicle?

6         A.   Yes.

7         Q.   How do you know that the conifer needles, that

8    you've seen photos, were not introduced during the

9    efforts by the fire department to put out the fire?

10        A.   Well, again, there's -- there's a protective

11   shield underneath the car, both plastic and metal, so if

12   there's anything like maybe water backsplash, again, the

13   site is mostly ivy.  The -- the needles are imbedded

14   within -- on the -- they're on the ground within --

15   amongst the ivy.  They're not directly -- they're not on

16   the ground.

17            I guess I can't rule out that -- you know,

18   that -- to me, again, the shielding underneath the car

19   with the protect- -- if there are any needles being

20   moved around, you know, or, again, any water backsplash

21   that they -- that would not have direct access to the

22   undercarriage of the car.

23        Q.   Are there any openings in the undercarriage?

24        A.   There are openings -- there are -- yes, there

25   are openings that -- that rodents can -- can -- can



1    access, yes, yes.

2        Q.    Okay.

3        A.    There were multiple openings.

4        Q.    Are there multiple openings that water can

5    access if sprayed at the undercarriage or on the ground

6    underneath the undercarriage?

7        A.    That's correct, yes.

8        Q.    Okay.  So you said earlier you can't rule out

9    the possibility that conifer needles might have been

10   introduced during --

11       A.    Right.

12       Q.    -- the fire extinguishing phase.  Did I get

13   that right?

14           MR. BREEN:  Objection; misstates his

15   testimony.

16       Q.    (By Mr. Russell)  Go ahead.  Is that your

17   opinion, that you can't rule out the possibility that

18   pine needles -- or conifer needles -- I'm sorry -- were

19   introduced during the fire extinguishing effort?

20       A.    Can't rule it out.

21       Q.    Okay.

22       A.    Although I think it's highly unlikely.

23       Q.    Okay.  Other than the conifer needles that

24   you've seen photos of, have you seen any other evidence

25   that a rodent built a nest in Ms. Foster's vehicle?  For



1   example, when you inspected the vehicle yesterday, did

2   you see any evidence of a rodent nest?

3       A.   Yesterday I didn't see any evidence of -- any

4   remains of a rodent nest.  It was --

5       Q.   Okay.

6       A.   The vehicle was damaged by fire.

7       Q.   Have you inspected any other automobiles after

8   a fire that was allegedly caused by nesting material

9   coming into contact with hot vehicle components?

10      A.   I have not.

11      Q.   Do you know, as an entomologist, who, as I

12  understand, spent some time studying the behavior of

13  rodents, do you know of that allegedly happening in

14  vehicles in the United States or elsewhere?

15      A.   Yes.  Specifically as it relates to Honda

16  CRVs, I've looked at the -- am I not understanding

17  the -- the question?

18      Q.   No.  Well, my question was broader, and I

19  didn't mean to interrupt you.

20           I understand that you were shown some -- shown

21  some documents yesterday by these two attorneys to your

22  right about Honda CRVs.  I'm asking about your work

23  outside of this case as an entomologist.  During --

24  during your work as an entolomo- -- let's just take --

25           At any time before yesterday, when you were



1   shown those documents by Tom and Peter, were you aware

2   of rodent nesting material allegedly causing a fire in

3   an automobile?

4       A.    I have not.

5       Q.    Okay.  So let's go through these exhibits.

6   What we've marked as Exhibit 1 to your deposition is a

7   subpoena, or at least Page 1 and Exhibit -- or I'm

8   sorry -- Schedule A of the subpoena that my office sent

9   to Tom and Peter's office.

10           Did you get a copy of that subpoena?

11      A.    I did, yes.

12      Q.    And did you -- in this file that you brought

13  with you today, did you make an effort to bring with you

14  everything that's listed on Schedule A?

15      A.    Everything should -- should be there, yes.

16      Q.    Okay.  And the only thing I didn't see in

17  there are notes.

18           Have you at any time made any written notes,

19  either handwritten or on a computer, other than what

20  we've marked as Exhibit 6?

21      A.    Exhibit 6, plus the -- the note.  The little

22  piece -- the piece of paper there, that was in the book.

23      Q.    (Indicating.)

24      A.    Yes, that one.

25      Q.    Anything -- any notes other than that?



 1      A.   No.

 2      Q.   Okay.  And -- oh.  And Category 12, your

 3  complete time and billing records, did you bring those

 4  with you?

 5      A.   That's on the thumb drive, yes.  I have kind

 6  of a spreadsheet in Excel that kind of -- I keep track

 7  of hours on this project, yes --

 8      Q.   Okay.

 9      A.   -- of the space.

10      Q.   Great.  So that's on the thumb drive?

11      A.   Yes.

12      Q.   I put in front of you Exhibit 2 to your

13  deposition.

14           Are these copies of photos that you took

15  during your inspection of a Honda CRV in Lafayette,

16  Indiana?

17      A.   That's correct.

18      Q.   And I guess the last photo is something -- on

19  Page 9 is something else.  It's a -- it's a rodent nest

20  in a -- in a rodent --

21      A.   Bait station.

22      Q.   -- bait station from a pig farm.

23      A.   Yes, that's correct.

24      Q.   Okay.

25           MR. RUSSELL:  Let's try to stay organized.



1   We'll do it this way.

2          Just continuing.

3          It's all one pile.

4          MR. BREEN:  Okay.  With this other article, 3?

5          MR. RUSSELL:  Correct, yeah, but my intent was

6   to just mark -- just clip it all together and --

7          MR. BREEN:  This all 3.  Okay.  Yeah.

8          MR. RUSSELL:  Yeah.  There's more coming.

9          MR. BREEN:  Rather than doing it separately.

10          MR. RUSSELL:  Yeah.

11     Q.   (By Mr. Russell)  Dr. Buczkowski, I put in

12  front of you Exhibit 3 to your deposition.

13          Are these research articles that you relied on

14  in forming your opinions in this case?

15     A.   That is correct.

16     Q.   Okay.  And did you author or participate in

17  editing any of these articles yourself?

18     A.   No.

19     Q.   Okay.  Is there any one article in particular

20  that you relied on in forming your opinions in this case

21  --

22     A.   I --

23     Q.   -- of this group?

24     A.   I relied on all of them.  I've -- I've read

25  all of them.  They all relate to rodent nesting



1   behavior, so yes, I used all of them.

2       Q.   Okay.  And in looking at them, I don't see

3   that any of them relate specifically to rodent nesting

4   and automobiles.  Am I reading that correctly?

5       A.   Yes.

6       Q.   This is just rodent nesting behavior in

7   general?

8       A.   Yes.

9       Q.   Okay.  And did -- we'll mark your initial

10  report in a moment, but did those articles form the

11  basis for your opinions that you've outlined on the

12  first couple of pages of Exhibit 5?

13      A.   Yes.  Articles as well as my -- my education,

14  my experience, my observations from the field.

15      Q.   Right.

16      A.   In general, my work with rodents.

17      Q.   Yes.  And in looking at Exhibit 5, there are

18  some references on Page -- this is 3.

19      A.   Yes.

20      Q.   Is the Corrigan article part of Exhibit 3?

21      A.   No.  That's the book.

22      Q.   Okay.  Is the Latham and Mason article part of

23  Exhibit 3?

24      A.   Yes.  That's the fist paper.

25      Q.   Great.



1        A.    The very top.

2        Q.    And then the other reference on Page 3 of

3    Exhibit 5 is something that you wrote a technical report

4    to the chemical manufacturing industry on the evaluation

5    of novel rodenticides for the control of house mice.

6             Do you have a copy of that here with you?

7        A.    I -- I -- I don't believe so.  No, I don't

8    have a copy of that one.

9        Q.    Okay.  Could you provide that to your attorney

10   so I can --

11       A.    Absolutely, yes.

12       Q.    -- read it?

13       A.    Yes.

14       Q.    Does -- does this -- does that technical

15   report have to do with your visit to the pig farm?

16       A.    Yes, that's correct, my research on the pig

17   farm.

18       Q.    Okay.  And just in layman's terms, what you

19   found on the -- during your research at the pig farm

20   that you believe relates to this case is that the

21   rodents -- you put out a bait trap at 8:00 at night, and

22   at 8:00 the next morning, you opened the bait trap and

23   there was -- there were -- there was a -- a nest in the

24   bait trap?

25       A.    A nest was --



1      Q.    Baby mice.

2      A.    Baby mice, yes.

3      Q.    Okay.  And I saw that in your report that you

4   said, I placed bait stations on the farm at 8 p.m. and

5   inspected them at 8 a.m. the following day.  By morning,

6   some bait stations were fully lined with nesting

7   material and had a litter of four to six pups.

8           So is that what you -- what you take from this

9   technical report that you prepared that you believe is

10  relevant to this case?

11     A.    Yes.  That's -- that's the main conclusion,

12  yes.  Yes.

13     Q.    Okay.  In that particular situation, what you

14  know is that 12 hours after you put the bait stations in

15  place, a nest was built and a litter was born.

16          Do you have any information as to when, during

17  that 12-hour period, the nest was completed?

18     A.    I believe the nest was completed at nighttime

19  when the mice are active.  Exactly when during that

20  time, I -- I -- I don't know exactly.

21     Q.    Okay.  You didn't have a video camera set up

22  inside the bait box --

23     A.    No.

24     Q.    -- or anything like that?

25     A.    No.



1     Q.    Okay.  And then in terms of the Latham/Mason
2   article that is the first article that's part of
3   Exhibit 3, is there anything in particular that you
4   relied upon from this article in formulating your
5   opinions that went into Exhibit 5?

6     A.    Exhibit 5.  Information on the general
7   behavior of mice, as well as to the -- when -- when the
8   time when they're active at dusk, at nighttime, nesting
9   preferences as far as what materials they collect.

10    Q.    Okay.  And I'm -- I'm paging through.  I've
11  never seen the Latham/Mason article before today.  I
12  know you've read it.

13          Is there a page or a paragraph that you can
14  refer me to that contains the information that you
15  relied upon in preparing Exhibit 5 from -- from this
16  particular article?

17    A.    I would say the -- the abstract is actually on
18  the -- on the very first article summarizes the whole
19  article, the main hypotheses and conclusions, so
20  probably the abstract is the best place, but also the
21  introduction provides information on rodent nesting
22  behavior and preferences, and I would say the
23  conclusions of the article.  The other sections are
24  maybe not that relevant, but especially the abstract, I
25  would concentrate on that.



1      Q.   And in the abstract, I see a sentence that

2   reads, Mice are often active during dawn/dusk and spend

3   their time patrolling their territories investigating

4   neighbors, odor cues, foraging, finding mates and

5   rearing litters.

6           Do you see that sentence?

7      A.   Yes, I see it.

8      Q.   Are there any other sentences in the abstract

9   in particular upon which you relied in -- in preparing

10   your report that we've marked as Exhibit 5?

11      A.   That is mostly the information that I used,

12   yes.

13      Q.   Okay.  We may not have properly identified

14   Exhibit 5.

15           Is Exhibit 5 the report that you prepared back

16   in January of 2018?

17      A.   Yes.

18      Q.   Okay.  And is that -- I'm sorry.  I see on

19   Page 3 that it's dated January 16, 2019.  So this is

20   actually January 2019 you prepared this report.

21      A.   I guess the -- yes, the date here --

22      Q.   Yes.

23      A.   -- it's '19 because it was --

24      Q.   That's consistent with my memory, is that I

25   received --



1       A.    It was earl- --

2       Q.    -- I received this report --

3       A.    -- earlier this year and not --

4       Q.    Yeah.

5       A.    -- the previous year, yes.

6       Q.    Okay.  Up until yesterday, did Exhibit 5

7    contain all of your opinions in this case?

8       A.    Up until yesterday, so -- I'm sorry.  Can you

9    repeat the question, please, because --

10      Q.    Up until yesterday, did Exhibit 5 contain all

11   of your opinions in this case?

12      A.    Yes.

13      Q.    Okay.  And then Exhibit 6, let's focus on D.

14   It says, Inside the vehicle there were needles.  The

15   needles are significant:  They perfectly match the size

16   and type of material that a rodent would use to nest.

17           Can we agree that that opinion is not

18   contained in Exhibit 5?

19           MR. BREEN:  Well, I'm going to object to the

20   extent that assumes that that's its own separate

21   opinion.

22      Q.    (By Mr. Russell)  Go ahead.

23      A.    So this Point D -- D -- well, I have seen

24   pictures of the -- the needles that were recovered from

25   the vehicle --



1       Q.   And I'm not --

2       A.   -- in --

3       Q.   -- trying to --

4       A.   -- in preparation.

5       Q.   I'm not trying to ask a tricky question.  I

6    just -- when I was preparing yesterday for this

7    deposition, and I was studying every sentence of

8    Exhibit 5, I didn't see any reference to conifer needles

9    from the Foster vehicle in Exhibit 5.

10          Do you -- can you point me to any reference to

11   needles or needles matching the size and type of

12   material a rodent would use to nest in Exhibit 5?

13      A.   No.  Except I guess on Page 2 there's about

14   halfway down the paragraph starting, In situations

15   involving vehicles, rodents may build a nest utilizing

16   materials that are present on the ground where the

17   vehicle is parked.  And that includes dried grass,

18   leaves, paper, but not specifically conifer needles.

19      Q.   Okay.  And there's no reference to the conifer

20   needles that were collected from the undercarriage of

21   Ms. Foster's vehicle in Exhibit 5, correct?

22      A.   No.

23      Q.   Okay.  I know I'm doing these out of order,

24   but is Exhibit 4 a current copy of your CV?

25      A.   Yes.



1       Q.   What -- I know this, but I -- I'm not sure I

2    knew this before this case.  Entomology is the study of

3    insects, correct?

4       A.   That's correct.

5       Q.   And in your job as a professor in the

6    Department of Entomology at Purdue, is part of your

7    research having to do with insects?

8       A.   Yes.  Yes.

9       Q.   Okay.

10      A.   Mm-hm.

11      Q.   For example, ants --

12      A.   Ants.

13      Q.   -- termites, that type of thing?

14      A.   Absolutely, yes.

15      Q.   Okay.  Do you have any research grants

16   currently?

17      A.   I -- I have several, yes.

18      Q.   Okay.

19      A.   I have several grants.

20      Q.   And do any of those grants have to do with

21   rodents?

22      A.   Let's see what I have.  Yes, I have one -- one

23   grant has to do -- so the project -- I had -- I had one

24   grant in 2019 that was related to -- to rodents, but I

25   guess that grant is currently -- the project is already



1    finished, so it's -- it's current for 2019, but the

2    project is already finished.

3        Q.   And how many grants related to insects do you

4    have currently?

5        A.   I have some industry funds to work on specific

6    insect projects, but I don't really have any big, like,

7    federal straight grant, yes.

8        Q.   Okay.

9        A.   Yeah.

10       Q.   Let me just get right to the point because I

11   don't -- I'm never -- we've never met before.  I don't

12   know what you do you at Purdue University.

13            What percentage of your time -- if we go to

14   last year, 2018, what percentage of your time was spent

15   studying rodents versus insects?

16       A.   I would say about a -- an 80/20 split.  80

17   percent insects and to 20 percent rodents.

18       Q.   And which -- in 2018, who funded your research

19   into rodent or rodents or rodent behavior?

20       A.   So mostly industry companies that develop

21   products for rodent control.  So most of my projects

22   relate to developing tools for controlling rodents:

23   Mice, rats.

24       Q.   Meaning poison?

25       A.   For example, yes.  Poisons, baits, toxic



1   baits, devices, traps, snap traps, bait stations.

2       Q.   Was any of your research on rodent or rodent

3   behavior in 2018 specifically related to rodent nesting?

4       A.   Well, I would say that all of my projects

5   relate to where the nesting -- in the way that -- where

6   you do broad entries means you always have to observe

7   their natural behavior, and then you have to -- you have

8   to know where the rodents are, so nesting -- I mean,

9   rodent nesting is really part of their survival in life

10  out in the wild, and so that always -- that always comes

11  into play in all of these projects.  That's always part

12  of -- you really have to be -- you have to observe the

13  rodents in the field and -- and you have to know

14  where -- where they nest.  So that's -- that's always

15  part of field and lab studies.

16      Q.   Based on your research into rodent nesting

17  behavior, have you found that rodents frequently nest in

18  automobiles?

19      A.   I have not done any research on that

20  specifically.

21      Q.   Okay.  Do you know, for example, whether

22  rodents have nested in Ford SUVs?

23      A.   I have not, but, for example, in the pig farm,

24  I have observed rodents nesting in the equipment:

25  Forklifts, scales, like mechanized equipment.



1   They've -- they've -- they have a preference for --

2   again, for any -- any space that is -- that is protected

3   and -- and -- and warm and provides a nesting habitat.

4   So they like to get into all kinds of equipment, not

5   just cars.

6        Q.   And that's what I was going to ask you.  You

7   said in your -- in Exhibit 5 that a mouse only needs

8   one-quarter of an inch of space to gain access --

9        A.   That's correct.

10       Q.   -- correct?

11       A.   Yes.

12       Q.   And so can we agree that every engine

13  compartment on the road a mouse could access to build a

14  nest?

15       A.   I would say that's -- that's -- that's true.

16  That's -- that's correct.  I mean, most cars are

17  underneath are -- basically have access for -- for

18  rodents.  Mice especially, yes.

19       Q.   Okay.  And similarly, in the exhaust system,

20  do you know whether other vehicles -- is there any

21  vehicle out on the road that has a system that can keep

22  a mouse out of the area around the exhaust system?

23       A.   As far as I know, there's -- there's no

24  vehicle out there that will keep a mouse out, but what

25  I -- what I think what relates to this case is there --



1    there are some designs that keep mice in once they get

2    in there.

3        Q.   Well, the mice get in in order to build a

4    nest, right?

5        A.   Mainly, yes.

6        Q.   Okay.

7        A.   To build a nest, yes.

8        Q.   And so once they get in and build a nest,

9    they're not looking to getting out, right?

10       A.   Well, they have to leave for various -- they

11   have to go and get food.  They have to -- they may not

12   be there permanently.  I mean, they -- they can go in

13   and out.

14       Q.   Right.  On the pig farm, what type of

15   equipment did the rodents build nests in?

16       A.   Forklifts, scales that are weighing equipment

17   that they use for weighing pig feed.  Any -- any type of

18   stored -- any kind of stored material.  I forget exactly

19   what -- what -- what else I looked at, but any -- any

20   mechanized equipment that is either in use or even

21   stored they will -- because the mice population at the

22   pig farm is just so out of control that it's

23   basically -- they will not -- that they will nest in --

24   in almost anything.

25       Q.   And you were -- you gave me a list earlier.



1   They look for dry --

2        A.    Protected areas.

3        Q.    -- protected areas that are protected from the

4   elements?

5        A.    Protected from the elements, protected from

6   predators, protected from other mice.  The biggest enemy

7   of a rodent is another rodent because they're in

8   competition for food, for nesting sites, so protected

9   from everything.  Yeah.  They -- they prefer their

10  privacy, and they like to feel safe, yes.

11       Q.    And is that, based on your research, a

12  complete list of what they look for, is a dry area

13  that's protected from -- from -- well, that's protected?

14       A.    Temperature extremes, for example, wind, rain.

15  Any -- any area that's kind of concealed, protected, I

16  think -- and that relates to rodent natural behavior.

17  They nest.  They evolved to nest in -- in -- in burrows.

18  They're -- you know, they live below ground, so they're

19  looking for places that kind of mimic their natural

20  nesting behavior in the wild, so that gave -- and places

21  are dark, kind of concealed where they can feel safe,

22  dry, warm.

23            That's another factor:  Warmth.  Again,

24  especially rodents are small, very small body size.

25  They're very susceptible to hypothermia because of their



1   high surface to body ratio so that they're -- they --
2   they need -- constantly need to burn energy to stay
3   warm.  They don't hibernate like other mammals, so in
4   the fall, during the cooler seasons, they will be
5   looking for anything that is a source of heat they will
6   prefer.

7       Q.   Okay.  Do they -- do they typically build a
8   nest near a food source?

9       A.   Their home ranges -- ranges can be, again,
10  depending.  If they -- typically they're near a food
11  source, yes, but they can also -- they've been known to
12  forage quite a -- quite a long distance, if needed.  So
13  they just kind of -- it just depends.  They prefer to
14  have the food source close to their nesting site.

15      Q.   And on the pig farm, for example, what were
16  they feeding on?

17      A.   Many, many different things, including some
18  pig feed, other mice -- lots of cannibalism -- human
19  food from the work -- stuff that the workers would leave
20  out, pig manure is a big one.

21      Q.   When you were at the location where Ms. Foster
22  parked yesterday, did you see any mice feed in the area?

23      A.   I did not observe any mice feeding.  I didn't
24  see any mice yesterday.  We were out there during the
25  day.



 1      Q.   I didn't -- I didn't articulate my question

 2   clearly.

 3           When you were at the area where Ms. Foster

 4   parked when she was inside the country club, as I

 5   understand it, you inspected that area --

 6      A.   Yes.

 7      Q.   -- correct?  Did you see any mice food in that

 8   area?

 9      A.   Absolutely, yes.  Yes.

10      Q.   What food did you see in that area?

11      A.   There was a -- there was a -- we actually

12   looked at the -- a retaining wall that kind of is --

13   kind of -- it goes along the whole parking area.  And I

14   thought that was a prime nesting habitat for mice,

15   again, for -- for a number of reasons.  There were these

16   big boulders and --

17      Q.   I'm sorry, Doctor, I wasn't asking about

18   nesting.

19           I didn't mean to interrupt.  I was just asking

20   about food right now.

21           MR. BREEN:  You gotta finish your answer.

22      A.   So that -- that kind of relates to my -- to

23   your question because there was above the -- the

24   retaining wall, there was -- there was a -- kind of a

25   landscaped area that was full of -- so there was grass



1   seed.  There was grass.  There was pine -- pine cones or

2   -- well, I would say conifer cones that had conifer

3   seeds in them.  So that's a rich source for mice.

4           They -- there's -- basically, most mice feed

5   on -- on grains and seeds --

6       Q.   (By Mr. Russell)  Okay.

7       A.   -- so there are lots of plants in the area

8   that could provide seeds, as well below ground food:

9   Earthworms, snails, protein sources for mice.

10                              (Exhibit No. 7 marked for

11                              identification.)

12      Q.   (By Mr. Russell)  Doctor, you've been handed

13  Exhibit 7 to your deposition.  I'll represent to you

14  that this is a Google Earth photo of the -- of the

15  parking lot at the Meridian Valley Country Club.

16          Is this the parking lot where -- that you

17  inspected yesterday?

18      A.   That's correct, yes.

19      Q.   And could you circle on Exhibit 7 where it is

20  that you understand Ms. Foster parked, please.

21      A.   (Witness complies.)

22      Q.   So somewhere in that -- along that retaining

23  wall that we can see in the lower left-hand corner of

24  Exhibit 7, correct?

25      A.   Yes.



1      Q.   Okay.  Did you see -- when you were there

2    yesterday, did you see any evidence of rodents in that

3    area?

4      A.   Um, I didn't see any direct evidence of

5    rodents such as live rodents.  Again, we're -- we were

6    there during -- during daytime, so rodents are not

7    active during the day.  We didn't see any rodent

8    droppings.

9      Q.   Okay.

10      A.   So no direct evidence of rodent activity.

11      Q.   Did you see any indirect evidence of rodent

12    activity in the area that you circled on Exhibit 7?

13      A.   What really stood out for me is that the

14    retaining wall was just -- we -- we actually -- I took

15    some pictures yesterday, I looked in there, and -- and

16    based on what I know, based on my -- based on my field

17    experience with rodents in similar situations, I -- I --

18    this looked like a prime rodent nesting habitat.

19      Q.   No.  And I understand that your opinion --

20    because I've -- I've -- I've seen it in the Exhibit 6.

21    I understand that your opinion is that that area of the

22    retaining wall is -- what you believe to be a prime

23    nesting location.  But I'm -- but I asked a different

24    question, which is, when you were there yesterday, did

25    you see any evidence that rodents have been in that area



1   anytime, such as droppings or nesting, a nest started or

2   anything like that that indicated to you that in fact

3   rodents have been there recently?

4       A.   I didn't observe any -- any direct evidence

5   for that.

6       Q.   Okay.  And have you seen any evidence -- have

7   Tom and Peter provided you with any evidence that the

8   Meridian Valley Country Club has had a problem with

9   rodents in their parking lot at any time?

10      A.   No.

11      Q.   Okay.  When you were out there yesterday, did

12  you talk to anyone at the Meridian Valley Country Club

13  about whether they've had a rodent problem of any kind

14  in their parking lot?

15      A.   No.

16      Q.   Okay.  Do you know whether any other vehicle

17  parked at any time in this parking lot shown in

18  Exhibit 7 has ever had a rodent nest built in it?

19      A.   I don't know that.

20      Q.   Were you provided with the deposition of

21  Ms. Foster's son?

22      A.   Son.  I don't believe so, no.

23      Q.   Okay.  Do you have any understanding as to

24  where Ms. Foster parked her CRV when she was at her

25  home?



1      A.   I don't know that.  I'm -- but I'm not

2  certain.  I may have seen this in some of the reports,

3  but I don't know for sure.

4      Q.   That's fine.

5           For example, you don't know whether she parked

6  in a garage or on the street?

7      A.   I can't say for sure, no.

8      Q.   All right.  Do you know whether there's

9  testimony in this case about whether there was ever a

10  rodent problem reported at Ms. Foster's home?

11      A.   No, I don't know that.

12                            (Exhibit No. 8 marked for

13                             identification.)

14      Q.   (By Mr. Russell)  Do you have Exhibit 8 in

15  front of you there, Doctor?

16      A.   Yes, I do.

17      Q.   And I'm sorry that they copied the back side.

18           MR. BREEN:  We'll redact it at some point I'm

19  sure.  Jesus.

20           MR. RUSSELL:  Off the record.

21                            (Discussion off the record.)

22      Q.   (By Mr. Russell)  The right side of Exhibit 8

23  are notes that you took that kind of summarize the

24  information that you believe is relevant to this case

25  from the Corrigan book entitled Rodent Control; is that



1    right?

2        A.    Yes.

3        Q.    Okay.  And I want to make sure I can read your

4    handwriting later.

5              It says, Rodents are explorers, neophilic --

6              What does "neophilic" mean?

7        A.    Neo is new.  Philic means to -- to like, to

8    love something.  So they like to -- they like new

9    things.  When there's -- when they find a new object

10   they haven't seen before, they kind of -- they like to

11   explore it.

12       Q.    Okay.  And to maintain body warmth,

13   opportunist nesting habits, rodents naturally gravitate

14   towards shadow areas.

15             I see.  So did I read that all correctly?

16       A.    Yes.

17       Q.    Okay.  And that's consistent with what you

18   said earlier, is that rodents like to nest -- build

19   their nests in dry, protected areas?

20       A.    Yes.

21       Q.    I should know this, but I don't.  Do -- do

22   rodents have babies at a particular time of year or is

23   that year-round?

24       A.    They have multiple litters throughout the

25   year, so year-round, yes.  Several -- several litters



1    per year.

2        Q.   Are there particular months when they are most

3    likely to have litters or is it just like humans, could

4    be year-round?

5        A.   The gestation cycles in mice are year-round,

6    yes.

7        Q.   Okay.  Do you know how many other cars were in

8    that parking lot that we see in Exhibit 7 during the

9    time that Ms. Foster's car was parked there?

10       A.   I was not provided with this.  I don't have

11   this information.  I don't know.

12       Q.   And I assume the answer's no, but are you

13   aware of any evidence that any other cars that were

14   parked in that parking lot had rodent nests built in

15   them that day?

16       A.   I -- I don't have any information on that.

17           MR. RUSSELL:  Okay.  I'm all set.  Take a

18   break?

19           MR. BREEN:  Yeah.  I just need to figure out

20   whether to ask some questions in this dep or just cover

21   it in the next, so let's just take five minutes --

22           MR. RUSSELL:  Sure.

23           MR. BREEN:  -- and then I'll -- yeah.

24           MR. RUSSELL:  Yeah.

25   ////



```
 1                        (Recess from 11:13 a.m. to

 2                         11:17 a.m.)

 3          MR. BREEN:  Okay.  This is counsel for

 4   plaintiffs.  I have no questions in this discovery

 5   deposition.  I'll do any follow up I wanted to do in the

 6   perpetuation deposition that will begin in a couple

 7   hours.

 8          MR. RUSSELL:  We are all set.

 9          THE COURT REPORTER:  Waive or reserve

10   signature?

11          MR. BREEN:  We'll -- we'll reserve.

12          THE COURT REPORTER:  And are you going to

13   order the original?

14          MR. RUSSELL:  Yes.

15          THE COURT REPORTER:  And do you want to

16   purchase a copy?

17          MR. BREEN:  Sure.

18                        (Signature reserved.)

19                        (Deposition concluded at

20                         11:18 a.m.)

21

22

23

24

25
```



```
 1   STATE OF WASHINGTON )
                         ) ss
 2   County of King      )

 3            I, Eva P. Jankovits, the undersigned Washington
     Certified Court Reporter, pursuant to RCW 5.28.010 authorized
 4   to administer oaths and affirmations in and for the State of
     Washington, do hereby certify:

 5

 6            That the annexed and foregoing deposition of
     GRZEGORZ BUCZKOWSKI, PH.D., was taken before me and completed
     on June 27, 2019, and thereafter was transcribed under my
 7   direction;

 8            I further certify that according to CR 30 (e) the
     witness was given the opportunity to examine, read and sign
 9   the deposition after the same was transcribed, unless
     indicated in the record that the review was reserved;

10

11            I further certify that I am not a relative or
     employee of any such attorney or counsel, and that I am not
     financially interested in the said action or the outcome
12   thereof;

13            I further certify that the witness before
     examination was by me duly sworn to testify the truth, the
14   whole truth and nothing but the truth;

15            I further certify that the deposition, as
     transcribed, is a full, true and correct transcript of the
16   testimony, including questions and answers, and all
     objections, motions and exceptions of counsel made and taken
17   at the time of the foregoing examination and was prepared
     pursuant to Washington Administrative Code 308-14-135, the
18   transcript preparation format guideline;

19            I further certify that I am herewith securely
     sealing the said deposition and promptly delivering the same
20   to Attorney David J. Russell.

21            IN WITNESS WHEREOF, I have hereunto set my
     signature this 10th day of July, 2019.

22                          Eva P. Jankovits

23   _____
       Eva P. Jankovits, Certified Court Reporter No. 1915
24     in and for the State of Washington, residing in
       Seattle, Washington.
25     My CCR certification expires 7/3/20.
```

